Our second case in the morning is people with the State of Illinois v. Jeremiah Campbell, 411-0517. For the appellant, Mr. Ryan. For the appellant, Mr. McNeil. You may proceed. May it please the court, counsel. I'm Marty Ryan from the Office of the State Appellate Defender. On behalf of Jeremiah Campbell, I'm intending to concentrate my arguments on the reasonable doubt argument, argument one, but of course I would answer any questions this court would have about anything in my briefs, either argument. What do you think your strongest argument or position is which would prompt this court to take the matter away from the jury? I understand that it's cumulative in part, but what's... The science, the scientific... I would answer your question this way, Your Honor. The scientific testimony, I think actually cuts in favor of acquittal rather than conviction, unbalanced, and when fit against the lay facts, the timeline. I mean, by all accounts, Jeremiah Campbell, no one sees anything. Jeremiah Campbell historically has never laid a hand on this little boy. Then supposedly, the mom leaves the house, the two, Mr. Campbell and little Galen are asleep in separate rooms and separate beds. And all of a sudden, up and beats this kid to death. That was so counterintuitive that it's such a strange scenario with really no reason to do so, no motive, no nothing. And to have this counterintuitive theory of the case, and then to bring in an expert who says this all had to happen, in her guess, it all had to happen in an hour. The kid didn't live more than an hour, in her guess, from the time the little boy sustains the liver injury. Now we're going to call your experts' opinions guesses, too. We shouldn't call hers guesses. Well, yes, and here's my, and well, I understand that. But the difference, I think the difference between the two experts is, when push comes to shove, Dr. Case just knows things. She just knows it's not a macrophage. She doesn't have to come down and say what else it is. She knows that there's no dead tissue, no necrotic tissue, which is indicative of an older injury, not just a fresh one, two, three hour injury. And she does admit, although she doesn't believe it to be so, that the child could have been injured more than three hours, could have been injured three hours before being brought to the emergency room unresponsive, although that's not her opinion as to what's likely. Well, doesn't your expert say, he also admits that yes, this could have, but it's not likely. But there are four areas of dispute. You know, Ralston goes through and circles the macrophages until counsel stops him on one of the slides. And he explains how a macrophage is a secondary immune response. And he explains, you know, how that means that this liver injury is a day old. She says, well, this liver looks so awful, it's like a car crash, and he couldn't have lived for over an hour. And when Ralston comes back on the stage, he actually had to look, because he had the, you know, when he got called, he got called as a state's witness and a defense witness. When he gets called later as a state's witness, I mean as a defense witness, pardon me, the next day, he's had time to look. And the only studies he finds on car crashes, he finds one, he finds where there's 55 car crash victims who had liver damage, and only one dies within an hour. He finds no scientific basis for this eyeballing. He explains on the, you know, the poor little kid had broken ribs on different sides and at different heights. I think one was higher than the other, according to all the testimony. That was undisputed. It was also undisputed that the bruises were differently colored. Dr. Ralston explains how, over time, the body processes iron from the bruises, and so something that's had longer to heal will be a different color. And while you can't say that one bruise is exactly 23 hours and 10 seconds old by looking at the color, you have a relative time when you have the same victim in the same area of the body. And he explains this, and it makes sense. And there's no, there's, there's like, there's, there's, in Dr. Case's case, this is what looks fresh. There's no rebuttal to the, to the explicit explanation of Dr. Ralston. Then there's the, and this one is an unknown. There is apparently some fluid called hemocidrine, I hope I'm pronouncing that correctly, in, that's found in the little boy's midbrain, which could indicate a 3 or 40-year-old injury, or it could have been from birth trauma. And Dr. Ralston says, we don't know. It could have been either or. We don't know unless we can look under a microscope, and unfortunately, Dr. Bowman, who did the autopsy, doesn't take the sample of fluid. Dr. Case knows it by looking at it. Well, it had to be. She knows everything by looking at it. And then she had, she hooked it up to something subjective like a car crash victim. Well, the boy wasn't in a car crash. But I want to go back to, to contrasting this with, again, the scenario. The child, the poor little boy, dies on a Friday morning. It's undisputed that it's blunt force trauma. It's not an accident. It's caused by an adult. By the state's evidence, he becomes ill with a runny nose and or a fever on Monday or Tuesday of that, earlier that week. He's not in daycare Wednesday, Thursday, or Friday. We have no information as to what she did with the child on Wednesday. Because the mom, I'm sorry, the Heavenly Grady's mother, Ms. Cooper, says that the only day that the child was with her that week was Thursday. So we have no idea. Maybe she stays home with the child. I don't know. So on Thursday, she drops the child off with her mother. And the child just sleeps, sleeps with her until she gets picked up. And then interestingly, apparently, Ms. Grady wants to have her hair done. So she brings the child to a relative of the defendant's who also has, who's watching children. And apparently, the condition there is you can bring the child over as long as the child's not sick. And the child goes from being too sick to go to daycare to not sick in that span. And then he's picked up. Later that evening, they're at apparently Jeremiah Campbell's mother's house. And while he's speaking with his family, Ms. Grady is in a separate room napping with Galen, who's again sleeping. Sorry, excuse me. Mr. Campbell apparently goes out and comes back late in the evening. Ms. Grady gets up early Friday morning. And from what she says, she just spontaneously decides then that she's going to have pictures taken with Galen and his cousin, whose name eludes me but lives out of town. Whereas her mother says, no, she's planned this all along. She bought separate outfits for each child and, in fact, left one of the outfits at my place. And I think this is just to explain, to provide a different explanation of why she's leaving to work. She elects to leave the child there because she wants to let him sleep. But she doesn't let him sleep. She makes him drink juice and puts Carmex on his lips. And I think it's to say that she can have it both ways. She let the child sleep but can say that she had an interaction with him to say that he looked fine to her. So the child is eventually found unresponsive. I'm guessing the emergency room call happens around 9.40 because I believe the ambulance driver says, we got someone at 9.42. So the call comes, I'm sure, immediately before that. And by 9.44 they're already gone because the ambulance driver breaks in and they're not there. He's made it unresponsive at 9.50. And his core temperature is already unresponsive and has no signs of life. His core temperature is already down 94. And according to the emergency room physician, to get to the no signs of life takes about 8 to 10 minutes. And then plus there would be an additional time for the core temperature to drop 5 degrees. But no one says what that is. Dr. Ralston's testimony fits. He says this child was beaten over the course of a week. The bruises on the head are a different color and a different state of healing than the bruises on the upper torso and arms. And then the two different rib fractures are different colors. This child's beaten over the course of the week. It explains why he's not in daycare Wednesday if he's beaten Tuesday night. It explains that after that Galen only goes to relatives who would not likely report anything and would take her word for anything. So if they see any bruises or anything like that, because the boy's clothed the whole time, he only goes to relatives. I'm guessing she stayed home with Galen because she didn't know what to do. She's giving him Motrin all week even though she says he's feeling better, even though he throws it up. She gives it to him Thursday night and he throws it up. She gives it to him Friday morning and he throws it up. If he's better, there's no reason to do this. Mr. O'Reilly? Yes. May I interrupt you? Yes. I'd like you to help me with an area here that I had trouble with when I was reading the briefs, and that is according to the defense theory of the case, these injuries occurred prior to Friday. There was testimony that on Thursday the little boy was running, dancing. He was energetic, according to certain testimony. These injuries that you indicate ultimately were fatal, according to the defense theory, were caused prior to that time frame. The jury heard evidence from the state's experts that with liver injuries such as these, there's no way that a child could be like that, act in that manner. So what's the jury to do with that and how did you explain that to the jury? My understanding is the source of the, the only person who says that he's, and correct me if I'm mistaken, I believe is Ms. Brady, whose interest it is to make him seem better, is to make it as if everything happened on Friday morning. And I believe Dr. Case, you know, also agreed with Dr. Walsted that even sustaining a liver injury earlier, hypothetically, the child would be able to walk, though the child wouldn't be happy. And then there was a disagreement between the two on whether Motrin would have any effect at all. But I think the problem is, because the argument is the child was beaten over time. So while it may have been a cumulative effect where the child is beaten Tuesday and then starts to feel better, and is beaten again, the child could have been beaten again Thursday night while Mr. Campbell is out, because by all accounts, he leaves at about 10 o'clock at night and comes back at 2 in the morning. So if she beats the child again, that explains the child being in bed and not feeling well after that point. Does that answer your question? It does, thank you. Well, just to follow up on Justice Harris's question, are you telling this Court that the only testimony that the child was active on Thursday came from his mother? I believe so. I don't think the father saw him much on that Thursday. The father last sees him Thursday, and it's as he's leaving, I think, Mr. Campbell's sister's house or something like that. Oh, no, that's what it was. It was the father's sister's house that has the daycare where he went to after the mother's house on Thursday. And Galen Cole Sr. comes there to see his sister, and his son is there, and he sees him briefly. He doesn't notice anything wrong. I don't recall there being any testimony from him that the boy was running around. I do recall there was testimony that at some point that he had noticed a head wound on his child and also chemical burn marks at some point earlier, prior to that day. I believe the testimony of Ms. Brady's mother was that the boy slept with her the entire time. And no one was called from the daycare as a witness. But I believe that the source of the running around, to my recollection, was from Ms. Brady, or that he was singing or jumping. But again, even if Dr. Ralston's testimony was that there would be times when the boy would feel better as the blood clots started to heal and then if he got beaten again, because again, it isn't that he's beaten to death on Tuesday night. It's that he's beaten some, which begins the process, and he's beaten over time. And the only person, well, perhaps Ms. Brady, we don't know, but it's not Mr. Campbell, because the evidence is undisputed that the only time he has, the only time he's alone with his child that whole week, is this three-hour window when she leaves at 6.15 in the morning and he's asleep, and so is the baby, the toddler, whatever. Does Ms. Brady testify? Yes. Oh, yes. Did anybody ask her what she did with the child on Wednesday? Your Honor, I'm not sure. I thought it was either they did or they didn't, and if they did, she gave an answer. I mean, that's not something the prosecution is the only person that can ask that. I think she was. I am not absolutely certain. She was asked what days of the week was the child in daycare, and she said Monday and Tuesday. But not Wednesday? Yes. But nobody asked her where the child was on Wednesday? I believe she was asked. I believe she didn't remember. And on Thursday, the child is with the maternal grandmother in the morning? Yes. And the child slept? Yes. But later in the day, the child goes to the paternal aunt's house? Yes, immediately thereafter, I believe. Where there are other children? Yes, I would imagine so. And is visited by his father, perhaps inadvertently. The father may not have known that he was there, but nonetheless, the father drops by his sister's house. Yes. Did anybody call the paternal aunt to testify? No. Okay. Ebony apparently also is the one that says, the child napped with me on Thursday. Thursday evening, yes. Which would have been after the time that she testified that the child was lively, dancing, laughing, moving around. Yes, yes, right, right. So, did the state's expert say that a child that suffered that degree of liver injury and the broken ribs would not have been dancing around and laughing and interacting on Thursday morning, afternoon, early evening? I believe that was the gist of what they were saying. Whether they said it in so many words, I would say so, yes. Well, I don't disagree with you that there's contradictions in the scientific evidence, but defendants sought a jury trial. The jury evaluated this evidence. What if they found one expert more believable than the other? Again, okay. More believable not only in terms of, well, the scientific proof is one expert says one thing, another expert says the other, but one of the experts relates better to the jury or seems to explain it in a way that they can understand and the other expert doesn't come off as well. I mean, so the jury chooses. What are we to do with that? Well, I understand that there is a high degree of deference to a jury verdict, and clearly the jury found something because they signed the guilty verdict. But that's not the end of it. No, I don't suggest it's the end of it, but... No, of course. You have to look at this. Again, I identified these four areas. There's whether or not there's macrophages, whether or not there's dead tissue in the liver. Macrophages in the liver, which is the secondary immune response, the necrotic or dead tissue in the liver, which is indicative of an injury 12 hours or days old, the different color bruises, because again, the state's theory is this kid was beaten all at once, all contemporaneously, or the hemocydrin, which is a not knowing. If Dr. Ralston is right about any of those things, then the state's theory of the case is gone. Well, except the state's theory of the case is the injuries that caused death were administered at one time. They said no. Well, yeah, no. I'm sorry. Their testimony was the injuries were administered contemporaneously. Well, except that we've got testimony about Thursday that some head notion is referenced. So that occurred before. Yes, there was some head, but all of the bruises, all of the things that would have contributed to liver, the state's theory of the case was that it was all at once. There was no suggestion that Ebony Brady beat this kid some on Tuesday and then Mr. Campbell finished the job on Friday. The state's theory of the case was that it was all at once. And given the conflicting scientific information, this counterintuitive theory that after being kind to the child and not laying a hand on the child for six months and being left sleeping in a separate room, within three hours the child is literally beaten to death for no reason. I'm not saying that's an impossible series of facts, but I'm saying the science does not back up that theory of the case. I think the jury had to have had a reasonable doubt, and I understand that it didn't, and it signed the verdict. But I think considering all the evidence, a rational jury had to have had a reasonable doubt, whether it was more probable than not that it was Mr. Campbell. So it almost seems like it was argued to the jury that either the mother killed her child or your client did. The jury might have said, we don't think Mom did it. So we don't really care what the experts say anyway. It's just when you've eliminated the impossible, whatever remains, however improbable, must be the truth, and arrived at the verdict that your client did it. If the jury's verdict is based on the idea that moms don't kill their kids, I would submit that that's not a reasonable inference from the evidence that a rational jury could have made under the facts of this case. But you're rephrasing what Justice Turner said. I didn't understand the question. It's that Ebony Brady didn't, because they saw her and evaluated her credibility as well. It's not that moms don't. We know moms do. And dads do. And strangers do. Yes. That's not the question. The question is, did the defendant do it in this case? Well, could the jury, you know, I see what you're saying, I think. On the either or, again, also it's not the defendant. The defendant doesn't have to prove that it's Ebony Brady. Right. But Dr. Ralston's testimony fits with the timeline that was introduced from Ms. Brady about when the child is sick and when the child is taken away from daycare where there would be a mandatory reporter who would report anything they saw when they changed the child's diapers. Thank you, counsel. We'll hear from you on rebuttal. May I please report? Mr. Ryan? To follow Dr. Ralston's and defendant's theory in this case, you have to assume that Ebony Brady was repeatedly beating her child with fists throughout the week, which caused her to remove the child from daycare to avoid detection. Yet, there's multiple witnesses where she dropped off her child throughout the week. Not throughout the week, Thursday. We don't know about Wednesday. Why nobody asked her about it, why that answer isn't in, I'm sure it is, perhaps she was asked and it's in the record, but it doesn't support either side. Maybe that's why it wasn't brought out. Yes, I can't remember any distinct testimony regarding the Wednesday timeline. But assuming Galen was beaten earlier in the week enough to take him out of daycare to avoid detection, why then would the mother drop him off at relatives? I guess assuming that the relatives were also going to cover up these potentially fatal injuries in a child, I don't know if any relative would be inhuman enough to cover up potentially fatal, I mean, according to the state's witnesses, these were blunt force traumas equal to that a child would sustain in a car crash. The liver was pulpified or macerated, I think were the words used in the analysis. Again, another indication that the injuries were sustained soon before the death of the child. Did your experts agree that there was necrotic tissue in the liver? Necrotic? No, Dr. Case testified after repeated sort of argumentative questions from defense counsel that there were cells that were undergoing neurosis in the liver. And these could be, by an inexperienced pathologist or anyone else, be misidentified as these macrophages. The dispute between the macrophages is that if there were their insignificant number in Galen's liver tissue, that would mean that the liver had started healing, meaning he had been alive for a significant amount of time after the injuries occurred. There weren't a significant number of macrophages, then his injuries were followed soon by death. Again, he talks about, the defendant talks about Dr. Case just knowing things. Again, all these responses were as a result of defense counsel's questions, that if you read the cold record even, they seem argumentative and not properly worded, at least for Dr. Case's expert opinion. She was qualified as an expert. She didn't just look at things with her naked eye. She analyzed the autopsy reports, she analyzed the slides, she analyzed Dr. Ralston's report even. She wasn't just looking at a selected slide from a defense expert and making an opinion. And I'm sorry to interrupt you, but I'm going to go back to the necrotic tissue question. And it's getting more towards what the defendant was saying were internal injuries. I'm not talking about superficial bruising that was apparent that predated Thursday. But the internal injuries, including the right-sided rib fractures, the left-sided rib fractures, the tissue damage internally in the chest cavity, the organ damage, is it the state's expert's opinions in this case that those injuries were sustained at one time? Yes. Within three hours of death? Yes. Okay. There was testimony as to the age of the right-sided rib fractures versus the left-sided rib fractures, and that the two were sustained at different times. Do you remember that? That was Dr. Ralston, yes. Did that go unchallenged, or did the state's two experts address that? I don't remember Dr. Case's exact testimony regarding the – I think they tried to make a big deal out of one rib being higher than the other rib. Of course, this is a one-year-old, so a small person anyway. I think any number of fist strikes, as everyone concluded, was the cause of the forced trauma. I think it's not unrealistic that they would be in separate places. And I'm pretty sure Dr. Case also, if she was asked by defense counsel, gave at least a logical enough answer for the question she was asked as to why the bruises were different colors and yet would still be sustained at the same time. Also, an important factor in this is that, just using simple math, it's two experts to one. I know Dr. Bowman had failed the forensic pathology exam multiple times. She still had the initial opinion here. She still was the person who performed the original autopsy. I think the jury could take that into account, as she was the only one who actually did firsthand analysis on Galen's body. Her initial conclusion was that the injuries were contemporaneous and they happened within three hours of death. And of course, it's undisputed that the defendant was alone with the child within those three hours. Again, going back to the defendant's suggestion here, Ebony Brady would have gone on this beating spree throughout the week of her child, dropping it off at multiple family members, including a family member of the dad, I guess hoping to not get caught, and then counting, I guess, on the child dying in the only three-hour window that the defendant was with the child alone in the whole week. Indeed, I think there was testimony from Ebony Brady that this was the first time the defendant had been alone with the child while she was at work ever. Again, this was between 6 a.m. and 9 a.m. There was evidence that, I think the defendant's own testimony, that he had been out drinking and getting high the night before until at least 2 a.m. So he gets home. I think a reasonable inference for the jury to make was that hungover at 6 a.m., first time alone with the child, the child had a cold. Everyone agreed with that. So presumably he would be making noise or whatever, and the worst that could happen did happen. I think that's a much more reasonable conclusion than Ebony Brady beating the kid throughout the week and counting on all these coincidences and family members not discovering or covering up these potentially fatal injuries. And, of course, to accept Dr. Ralston's expert opinion, this timeline would almost have to be accepted as well. Instead, Dr. Bowman and Dr. Case both testified consistently that there were no significant number of macrophages in the liver tissue, which means that the injuries were recent and soon before death. And for the jury to conclude that, especially when looking at the evidence in the light most favorable to the prosecutor, it was reasonable. Again, it's undisputed that the defendant was alone for the three hours prior to Galen's death. This case was a mistrial the first time, correct? Yes. What experts testified the first trial? I'm not entirely sure. I know Dr. Case didn't. I'm not sure if Dr. Ralston did or not. Dr. Bowman did. But you know Casey did not. Is that what you said? I think so, yes. Okay. I think the defendant also makes a comment about Dr. Case's compensation in this case. Dr. Ralston wasn't doing it for free either. He got $2,500 and I think Case got $2,100. Well, counsel said he testified for both the prosecution and the defense. Is that correct? I thought. That took me as a surprise, too. I don't know if he was called as a hostile state witness at first, but it seemed that he was a defense witness to me. I think he was cross-examined by the state, if I'm not mistaken. I don't remember the record exactly, but he was either a hostile state's witness or a defense witness, I would say. But at the time that he testified, he was actually the forensic pathologist for the Macon County Coroner. Is that correct? I think so. I don't know if the timeline was Dr. Bowman was the coroner and he was an assistant or if he took over after her. He always plays Dr. Bowman. Okay. All right. Again, he didn't perform the autopsy here. No, she performed the autopsy. Correct. I don't know. Maybe he might have been a state's witness in the first trial. I'm sure Mr. Ryan will clear that up. But as far as the verdict here, this was a rational jury. This was a reasonable conclusion to come to this court. In People v. Lynn stated the well-settled principle that a conflict between experts does not necessitate the finding that the evidence was insufficient to support conviction. Trier of fact may either accept or reject that conclusion. Trier of fact in this case, the jury obviously accepted Bowman's and Case's corroborating opinions and rejected Ralston's. This is especially reasonable when considering the timeline that would have to happen for Dr. Ralston's expert opinion to make any sense. If there are no more questions. Thank you. Thank you. It was just Dr. Bowman at the first trial. Dr. Ralston didn't testify. In fact, it was a different defense counsel as well. And I believe Dan Foltz was the defense lawyer at the second trial. And he was the one who turned to Dr. Ralston to ask for his evaluation in light of some of the problems that had come to light over Dr. Bowman. Dr. Ralston did testify twice at the second trial. He was called as a state witness. He was called, I believe, after Dr. Bowman testified, but prior to Dr. Case's. And I think this way the state was trying, because some of it was agreed to. Everyone agreed that this child was beaten to death by an adult. It was blunt force trauma. It was not an accident. The kid didn't fall down the stairs. And then after Dr. Case called, he was again called, but more briefly, as a defense witness. And you could call him the defense expert, but he did testify twice. The defense case is not that we have to assume that Ebony Brady beat this child to death, although I think that is the most likely thing, and that it's only that there is a reasonable doubt as to Jeremiah Campbell's guilt. As to the idea that the relatives would cover for her, the idea is that not so much that they would cover for her, but the relatives would be much more likely than a professional daycare worker who has no familial contact with you to accept an innocent explanation and not call the police, or not call DCFS. Whereas in someone who works for a daycare, who is purely doing this professionally, thinks I have to say something, and you can sort it out with them. Also, again... Well, if you're going to go down that route, though, why does the paternal aunt, who apparently is on good terms with her brother, why would she feel that way? I would think she might feel the opposite. Apparently they had a good relationship. Apparently Mr. Cole, Galen Cole Sr., and Ms. Brady had an amicable split, you know, for a change. Also, again, as to counsel's comment about the car crash, again, there was no scientific basis for that. And to clarify, as to Dr. Case's testimony about divitalized tissue, she said it was divitalized, but she refused to recognize a distinction between divitalized and necrotic or dead. Dr. Ralston explained that divitalized tissue is tissue that's still... that's lost its blood supply, but is still alive, meaning that it isn't starting to rot or decay, whereas dead or necrotic tissue is starting to rot or decay. And his testimony was these were separate. I believe counsel said that Dr. Case had said that Ralston may be confusing dying tissue with macrophages, and these were separate areas. There were separate cells of macrophages versus an area of necrotic tissue. As for the so-called argumentative cross-examination, counsel is trying to pin the case down. A big part of this case is whether or not Ralston is correct that these are macrophages, because then it isn't Jeremiah Campbell. And he's trying to pin her down as to what she actually thinks these cells are if they're not, because then that can actually be rebutted. The guy's trying to do his job. And to say that there was a scientific basis, you know, for what she was saying, the one-hour thing for car crashes is just something that is known by people who do my job. Or these bruises looked fresh to me. I thought I understood that she said this is the amount of force that could be seen in a motorcycle accident. Yes. She just analogized it. She says this looks really awful. The amount of force would be like a car crash. Did she say that the people who get liver injuries, generically, in car crashes, die within a few hours? Within one hour. That was the basis for her one-hour estimate with the liver testimony, was this liver is macerated. This is similar to a car. The amount of force is so bad it's like a car crash. The car crash people live. The one-hour thing came from the car crash. It was directly from the allergy. Also, as for Dr. Bowman's testimony, again, Dr. Bowman's never asked about macrophages in the liver at all. The state apparently had so little confidence in her that they relied on Dr. Case for that. She didn't give any testimony about necrotic tissue. She didn't have an explanation for the different color bruises. And, of course, she's the one who didn't take a sample of the hemocidin in the child's midbrain. Dr. Bowman testified blood contains inflammatory cells that help attempt to repair tissues. Inflammatory cells were present, but they had not yet begun reacting with the tissues, indicating the injuries were recent. Whether she uses the word macrophage or not, she does testify regarding that. My understanding is her testimony of that, and macrophages and the recency, is about the lung tissue. She has not asked at the second trial about the liver damage. And no one says the lung injuries are fatal. Well, except that she says that she's the one that testifies lung injuries like this, the child wouldn't be able to breathe. If you can't breathe, you die. Yes, well, and according to Ebony Brady's testimony, the child was breathing. Of course, that would be before, so I guess that would fit. Never mind. Yes, but her testimony, yes, but the two board-certified physicians have a different cause to say that it's the liver. If I may have a moment, the mic is right, I have a red light. Sure, a brief one. Yes. Oh, yes, the last thing is, again, I don't know if I covered this. I personally, I would have a different experience  he probably just wants to sleep. But I want to make clear, Dr. Case didn't give an explanation as to how you would have differently colored bruises on the ribs and the differently broken bruises and why that would be a different age. Thank you, counsel.